391 So.2d 520 (1980)
SOUND DOCTOR RECORDING STUDIO, INC., Plaintiff/Defendant in Reconvention-Appellee,
v.
Steve CONN, Defendant/Plaintiff in Reconvention-Appellant.
No. 7864.
Court of Appeal of Louisiana, Third Circuit.
November 12, 1980.
*521 Gravel, Robertson & Brady, James J. Brady, Alexandria, for defendant/plaintiff in reconvention-appellant.
Provosty, Sadler & deLaunay, H. Brennen Sadler, Alexandria, for plaintiff/defendant in reconvention-appellee.
Before DOMENGEAUX, GUIDRY and STOKER, JJ.
DOMENGEAUX, Judge.
Sound Doctor Recording Studio, Inc. (Sound Doctor) brought this suit on open account against Steve Conn, a musician, song writer, and singer, to recover $3,065.00 in expenses allegedly incurred by Sound Doctor on behalf of Conn. Conn reconvened against Sound Doctor alleging that Sound Doctor commercially used, without Conn's permission, certain of his copyrighted tunes, jingles, and/or songs. He further alleged that Sound Doctor ran certain ads, again without his permission, which claimed that Conn was associated with or was working with Sound Doctor at a time when no such relationship existed. Conn claimed these acts by Sound Doctor caused him financial loss, embarrassment, and humiliation, and loss of professional standing to the tune of $6,500.00.
After trial on the merits, the court opined that plaintiff, Sound Doctor, was not entitled to recover on open account since there was no agreement to pay a specific sum. It did rule, however, based on La.C.C.P. Art. 862, that "Sound Doctor Recording Studio, Inc., is entitled to market, sell and distribute the musical tunes of defendant [Steve Conn] which were recorded at plaintiff's recording studio, and to recoup therefrom its expenses and such other benefits to which it might be entitled." Judgment was *522 signed February 7, 1980, and the defendant has appealed.
The following facts were indisputably established by the testimony of Steve Conn and Robert Vernon, the president, majority stockholder, and chief sound engineer of Sound Doctor.
In early to mid-1977, Conn and others were asked by Vernon to record musical work at Sound Doctor Recording Studio. Conn (and presumably the others) acceded to this request. Shortly before recording was to begin, Conn asked Vernon "What's in this for you?" or words to that effect, to which Vernon replied "We'll worry about that down the line." After this brief and inconclusive rapport, Conn recorded approximately twelve tunes at the recording studio. These tunes were recorded on a "master tape". At no time did Conn and Vernon engage in any verbal or written agreement regarding any recompense to Vernon or Sound Doctor for recording time given to Conn.
Subsequent to the recording session, Conn participated in a "musical showcase"-an exhibition of local musical talent arranged by Vernon-which was designed to appeal to Mr. Judd Phillips, a representative of Mercury-Phonograph, a recording company, for whose benefit the exhibition was staged.
Later, in June or July of 1977, Vernon and Conn traveled to New York City for the purpose of discussing with Ms. Helena Bruno of Chapel Music, a large publishing company, the possibility of publishing some of Conn's music. Shortly thereafter, while still in New York, Conn inexplicably severed his business relationship with Vernon and Sound Doctor Recording Studio.
Sound Doctor has retained possession of the "master tape" on which are recorded Conn's tunes but it has never been able to secure Conn's oral or written permission to market, sell, or distribute the tunes recorded on this tape.
Nothing has ever been paid to Sound Doctor by Conn for its efforts to record and promote Conn's music. For this reason, Sound Doctor instituted suit on open account hoping to recover for 66 hours of uncompensated studio time with an alleged value of $30.00 per hour (or $1,980.00), $1,000.00 expended on the fruitless trip to New York, and $85.00 which represented the cost of the tape.
The trial court correctly held that Sound Doctor was not entitled to recover on open account. Neither party has appealed from that determination. We believe, however, that the lower court incorrectly held that Sound Doctor was entitled under La.C.C.P. Art. 862, to market, sell, and distribute the musical tunes of Steve Conn.
La.C.C.P. Article 862 provides:
"Except as provided in Article 1703, [default judgments], a final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings and the latter contain no prayer for general and equitable relief."
The trial court was of the opinion that the relief accorded plaintiff was justified under the relevant facts that were properly proven at the trial. We are left wondering, by the court's brief reasons for judgment, which relevant facts were properly proven and which were not. We are also left wondering which law, or which theory of recovery entitles plaintiff to market, sell, and distribute the songs of another, and to recoup an unspecified amount of expenses as well as other unknown benefits "to which it might be entitled."
Sound Doctor argues that sufficient facts were proven to support a judgment in its favor based upon the theories of implied contract (La.C.C. Art. 1811)[1] or quasi contract/quantum meruit (La.C.C. Arts. 1965, *523 2292-2294).[2] Steve Conn argues that the judgment creates a contract of mandate between the parties. He urges reversal on the basis that the facts do not support such a judgment.
We find the judgment does create a contract of mandate between Conn and Sound Doctor because it authorizes Sound Doctor to market, sell, and distribute defendant's tunes. La.C.C. Art. 2985.[3] The facts do not support such a judgment because a contract of mandate was never created by the parties, nor was one intended to be created. Robert Vernon admitted that he never had Conn's permission to market, sell, or distribute the songs. Further, the record demonstrates that neither Vernon nor Sound Doctor ever procured Conn's consent, either expressed or implied, to transact any business on Conn's behalf. Therefore, the judgment as rendered cannot be sustained.
The record establishes that neither party is entitled to relief. La.C.C. Art. 1779 lists four requisites which are necessary to the validity of every contract: (1) parties legally capable of contracting; (2) their consent legally given; (3) a certain object which forms the matter of agreement; and (4) a lawful purpose. Sound Doctor is not entitled to recover under the theory of implied contract because two essential elements are lacking. From the facts surrounding the relationship between Sound Doctor and Steve Conn, we conclude: (1) there was no express or implied consent to contract, and (2) there was no certain object which formed the matter of agreement.
The most that can be said of the relationship existing between Sound Doctor and Steve Conn is that Conn recorded songs at Sound Doctor Recording Studio at the continued insistence of Robert Vernon; that Conn participated in a "musical showcase" arranged by Vernon; and that Conn traveled to New York, at Vernon's expense, to meet with a representative of a publishing company. We do not think these facts, especially when considered in the light of other facts duly established by testimony (discussed hereinafter), are sufficient to support a finding of an implied contract.
Those other facts demonstrate a complete lack of mutuality, or meeting of the minds. Although both parties may have assumed that Conn's songs might eventually be sold as a result of the efforts of Conn and Vernon, this common goal or desire was never discussed. Even if this goal had been commonly agreed upon, when might an implied contract have been confected and the parties bound thereto? There was no contract when the songs were being recorded because the studio time was being provided free of charge. Conn's testimony to this *524 effect was corroborated by that of J. D. Milliner, a fellow musician who recorded with Conn at Vernon's studio. Although this testimony clashes with that of Vernon who testified he was "fronting" time to the musicians, the musicians' understanding that the time was provided free is reasonable in the light of other circumstances. For instance, at that time, Vernon was a relative newcomer to the recording business, having opened his studio approximately six months before. Conn felt that Vernon was seeking to gain "prestige through association" by having Conn and other musicians record at his studio. Vernon admitted that he solicited Conn's services and also admitted that he considered Conn to be one of the area's best musicians. Under this set of circumstances, Conn's belief that the studio time was being provided free of charge was a reasonable one.
In contrast, Vernon testified he was fronting time to the musicians. "Fronting" was essentially a credit arrangement whereby a musician would record his work at a studio but would not pay for the time used until the recordings were successfully marketed. Vernon claims that Conn was aware that theirs was such an arrangement. Conn denied that he agreed to or was aware of a fronting arrangement. We conclude that if Vernon had told Conn of the fronting arrangement, there would have been no need for Conn to ask the question: "What's in this for you?" because he demonstrated from his testimony that he (Conn) was very familiar with the term fronting. In any event, Vernon had an excellent opportunity in the early stage of their relationship to explain what he expected of that relationship when he was questioned by Conn. Instead of answering forthrightly, however, Vernon's answer "We'll worry about that down the line" was vague and uncertain.
To further refute the contention that Vernon was fronting him time, Conn testified that at the time the recording took place in 1977, he had a recording studio in his backyard upon which he could make demonstration tapes for distribution. According to Conn, although Vernon's recording studio was more sophisticated, he, Conn, considered the tape produced there nothing more than a demonstration tape (although of a higher quality than what could be produced in his backyard studio), rather than a "master tape" which Vernon claimed it was. A "master tape" is of such quality that record albums meant for retail sales can be produced from the sound contained on the tape without further need of the musician's talents. Conn testified that this tape is not a "master tape" because more studio work is required of the musicians to perfect and polish the sound already recorded thereon. Again, J. D. Milliner corroborated Conn's testimony that the tape recorded at Sound Doctor Recording Studio was only a rough demonstration.
Did the parties, by their actions, implicitly contract with one another subsequent to the recording session? Again we think not. Sound Doctor argues that Conn's participation in the musical showcase and his acceptance of Sound Doctor's offer to go to New York were evidence of an implied contract. We disagree with this contention. We note that Sound Doctor made no claim for expenses incurred in producing the musical showcase. Obviously, he did not (and does not) expect any compensation from defendant for expenses incurred in arranging the showcase, especially since no agreements or commitments resulted therefrom.[4] Of course, if something would have developed as a result of Vernon's efforts, Sound Doctor's argument that a contract was created at that time might have more merit.
As for the trip to New York, if Conn and Ms. Bruno had reached an agreement as a result of Vernon's efforts, then Sound Doctor would have been entitled to some type of compensation. Vernon needed Conn to accompany him on the trip to New York, because he (Vernon) recognized that he did not have a contract with Mr. Conn and that *525 he did not have the right to contractually bind Conn. We note in this regard that Vernon's testimony indicates that he had other business to tend to in New York-he was not there solely to promote the music and talents of Steve Conn.
Finally, we think it is worthy of mention that both Conn and Vernon testified that some form of payment to Sound Doctor was anticipated but only if the tape made at the recording studio or Conn's musical talents were sold or successfully marketed as a result of Sound Doctor's (and Vernon's) efforts. In that event, both Sound Doctor (Vernon) and Conn would have reaped the benefits. The record is devoid of any understanding, though, that their business relationship was intended to endure until Sound Doctor's (Vernon's) efforts bore fruit. For these reasons, we do not think any enforceable contract was ever created.
Sound Doctor argues alternatively that it is entitled to an award based on the equitable doctrine of quantum meruit. In Swiftships, Inc. v. Burdin, 338 So.2d 1193 (La.App. 3rd Cir. 1976), this Court said with respect to that doctrine:
"Quantum meruit is an equitable doctrine, based on the concept that no one who benefits by the labor and materials of another should be unjustly enriched thereby. Under those circumstances, the law implies a promise to pay a reasonable amount for the labor and materials furnished, even in the absence of a specific contract therefor. LSA-C.C. arts. 1965, 2292-2294; Jones v. City of Lake Charles, 295 So.2d 914 (La.App. 3 Cir. 1974); Custom Builders & Supply, Inc. v. Revels, 310 So.2d 862 (La.App. 3 Cir. 1975).
Generally, the plaintiff who establishes his right to be compensated on quantum meruit should recover as much as he reasonably deserves for his services, or for the labor and materials which he has furnished for the defendant's benefit. The amount which he can recover on quantum meruit, however, is subject to a double limitation: (1) Plaintiff cannot recover more than the actual value of the materials and labor furnished for defendant, including a fair profit; and (2) plaintiff cannot recover more than the amount defendant was enriched by his furnishing of labor and materials. Custom Builders & Supply, Inc. v. Revels, supra."
Sound Doctor claims the value of the labor and materials furnished by it was $3,065.00. We note that $1,980.00 of that claim is for studio time. We believe the record supports a determination that this time was given to Conn free of charge (see discussion, supra) and cannot properly form part of an award based on quantum meruit.
With respect to the expense allegedly incurred on the trip to New York, Sound Doctor claimed $1,000.00 worth of expenses in its petition. However, this amount was later adjusted downward to $900.00 by Vernon during his testimony. Further, as we commented previously, Vernon had other business to tend to in New York besides the promoting of Conn's talents. Yet he seems to have claimed all of his New York expenses in his suit against Conn. Vernon produced no evidence to substantiate his claim for expenses on the New York trip. We think he has completely failed to prove the amount of his expenses.
Finally, the last item of expenses claimed is $85.00 for the tape. Sound Doctor is clearly not entitled to recover this amount. The tape itself is locked safely away in the recording studio. Steven Conn has made no claim to ownership of the tape. His only claim is to ownership of the songs recorded thereon. Sound Doctor need only erase Conn's songs from the tape to restore the tape to its original condition. We thus conclude that Sound Doctor Recording Studio has simply failed to prove that it is entitled to any amount based on the equitable doctrine of quantum meruit.
The trial court did not mention Steve Conn's reconventional demand. Under established jurisprudence, such silence on the part of the District Court is deemed a rejection of all demands not considered. Cagle v. Spade Drilling Company, Inc., 325 So.2d 354 (La.App. 3rd Cir. 1975); Hebert v. Valenti, 235 So.2d 193 (La.App. 4th Cir. *526 1970). We find that there is simply no evidence which would support a judgment in favor of plaintiff in reconvention, Steve Conn, so we affirm the trial court's rejection of defendant's reconventional demand.
For the above and foregoing reasons the judgment of the District Court in favor of sound Doctor Recording Studio, Inc. on its original demand against defendant Steve Conn is reversed. The judgment of the District Court rejecting the demands of the plaintiff in reconvention, Steve Conn, is affirmed.
It is hereby Ordered, Adjudged, and Decreed that all demands be dismissed and that the costs be equally divided between Sound Doctor Recording Studio, Inc. and Steve Conn.
AFFIRMED IN PART, REVERSED IN PART AND DISMISSED.
NOTES
[1] "Art. 1811. The proposition as well as the assent to a contract may be express or implied:

Express when evinced by words, either written or spoken;
Implied, when it is manifested by actions, even by silence or by inaction, in cases in which they can from circumstances be supposed to mean, or by legal presumption are directed to be considered as evidence of an assent."
[2] "Art. 1965. The equity intended by this rule is founded in the christian principle not to do unto others that which we would not wish others should do unto us; and on the moral maxim of the law that no one ought to enrich himself at the expense of another. When the law of the land, and that which the parties have made for themselves by their contract, are silent, courts must apply these principles to determine what ought to be incidents to a contract, which are required by equity."

"Art. 2292. Certain obligations are contracted without any agreement, either on the part of the person bound, or of him in whose favor the obligation takes place.
Some are imposed by the sole authority of the laws, others from an act done by the party obliged, or in his favor.
The first are such engagements as result from tutorship, curatorship, neighborhood, common property, the acquisition of an inheritance, and other cases of a like nature.
The obligations, which arise from a fact, personal to him who is bound, or relative to him, result either from quasi contracts, or from offenses and quasi-offenses."
"Art. 2293. Quasi contracts are the lawful and purely voluntary act of a man, from which there results any obliteration whatever to a third person, and sometimes a reciprocal obligation between the parties."
"Art. 2294. All acts, from which there results an obligation without any agreement, in the manner expressed in the preceding article, form quasi contracts. But there are two principal kinds which give rise to them, to wit: The transaction of another's business, and the payment of a thing not due."
[3] "Art. 2985. A mandate, procuration or letter of attorney is an act by which one person gives power to another to transact for him and in his name, one or several affairs."
[4] The exhibition exposed the talents of several other musicians or groups of musicians in addition to defendant.